Mr. Hume, you have reserved two minutes for rebuttal, so that gives you eight minutes out of the gate. Let's just make sure everybody's ready. I think we are. The floor is yours. You may proceed. Thank you, Your Honor. May it please the Court, James Hume of Aaron Fox Schiff for the appellant, NTS. By this appeal, we're asking the Court to apply the Frustration of Purpose Doctrine to what is really a unique case, and it's unique for two primary reasons. It involves a retail lease for 5th Avenue Space that was signed on January 17, 2020, with a lease commencement date of May 1, 2020. Needless to say, we all know what happened. Right. So the date. January. So the first one is that this is the unique situation where the lease was signed before the pandemic, but it didn't sort of kick in until after. It wasn't to start until well after the pandemic, when things actually shut down. This lease, contrary to the findings of the district court, did not assign the risk of the COVID pandemic to NTS, and I'll go into that in the detail of time that I have. The Frustration of Purpose Doctrine, I think, was best described by this Court in the MacArthur case. It says it's focused on events which materially affect the consideration received by one party, where both parties can perform, but the performance by one party would no longer give that party what induced him to make the bargain in the first place. The Court said, thus frustrated. You were able to open this retail space once the pandemic restrictions eased, were you not? No, we weren't, because, well, once they eased, yes, we ultimately could have, but a key ingredient here is this was only a three-year lease, and it required a substantial investment by the tenant to rehab the space in that time, and frankly, the timing was so critical here, as Mr. Reinecker said in his declarations before the Court, that it no longer was feasible for the company to do that. Why? You could have opened in June of 2020, according to the record. The construction restrictions were lifted on June 8th, it couldn't have been operated until late June, but of course, here, we were barred from even entering the space and having anyone on premises until. It wasn't going to be profitable because of the short time period, and also because of the fact that under COVID, people weren't out in the streets much, but that's never, that's not the test. We have to ignore that fact, don't we? I don't think so. I think that's- Why? Why? Those are the- Circumstances happen all the time, and businesses make judgments about decisions, and they don't work out. It may be because of weather, it may be because of something that happens externally to the company. Well, this was supposed to be a first class space on Fifth Avenue, and as you know, by the summer, Fifth Avenue, even after things could open, was still largely boarded up. But didn't you, in section 5.05 of the lease, assume the risks that circumstances could change? There could be natural occurrences, for example? No, Your Honor. I don't think 5.05 does that at all, and I think the district court had misread it. First of all, that's in the utility section of the lease, and it has several provisions in it. It says- No, it's titled, Interruption of Access, Use of Services. Right. And it's in the utility section of the lease. That's Article 5 of the lease is utilities. And if you look at the first sentence, it says, Landlord shall not be liable for any failure to provide access, beneficial use, or furnished services or utilities. That's not an issue in this case. This is not a lack of access. This clause simply doesn't go to that, and these are to be strictly construed under New York law. It also says that your client shall not be entitled to damages or relieved of the obligation to pay all sums due. Here under, we are not seeking damages, and we're not seeking to be relieved of the obligation to pay damages under the lease. We're seeking rescission of the lease. That's been at the core of the case. That's count one of the complaint. It's the equitable remedy for frustration of purpose. It may be, but doesn't this provide a strong indication of allocation of risk that is transferable to whatever your belief is you're seeking? No, because it's talking about access, and it's not triggered by this provision, and it gives the landlord contractual protection from breach of lease claims. But they could have said- I'm not sure you're assigning the risk for one area of possible relief, but it's irrelevant as far as any other relief. Well, in this case, the impact of the COVID pandemic was much greater than that. We had the shutdown orders, which is only one component of it. We had the loss of the clientele for this store. Well, I think everybody gets that. Right. But I guess the question is, I mean, there are leases that have similar provisions that we've upheld as, you know, basically ruling out impossibility. And the most recently we did this just this year in JN Contemporary Art versus Phillips Auctioneers. Are you familiar with that? Yeah, I am. And that- Well, how is this case different from that? Well, for one thing, there was an express clause there that gave the gallery the right to terminate the contract and not have any obligation to the person that put up the art. So that there was an express provision that was being enforced in that case that fit. That's not what we're seeking here. This is the equitable remedy of rescission for frustration. And I think it's- The impossibility only went to the first few months. It was possible. But during those- That was covered, right? Right. I mean, that was taken care of. The bankruptcy judge did give some credit for that period of time. I think it was 68 days. So your main argument is frustration? It's frustration of the lease. And as I said, this provision is to be narrowly construed. And we think that it offers liability protection to the landlord. But it doesn't go to the frustration. The clause could have said, nor may tenant rescind this lease, nor may it raise frustration of purpose. It doesn't do that. And I submit that if the court were to rule that this clause is the reason that frustration is not available, as a practical matter, what you're saying is frustration of purpose doesn't really exist when it comes to leases. Can you take into account evidence of the purpose extraneous to the document, to the contract? I think you- Yes, because you can look at the events and all of that. And I don't know that you have to here, because the purposes can be taken from this lease where you have to operate a first class retail operation consistent with like retailers on the 5th Avenue corridor. Clearly, and I think you can then say, who are the customers for 5th Avenue retailers? They're primarily tourists and the office workers. Even the summer office workers were only back at 40%. So it means, and this lease term- But the lease doesn't say anything about clientele, office workers, and tourists? No, it doesn't. It doesn't. It says first class store consistent with those on 5th Avenue. But I think you can infer from that to go further on what that means, what's the audience there for that? If you were correct, couldn't every retail space along 5th Avenue rescind the lease? No, I think the Gap case is a good example of that. It was a 16-year lease and they were arguing in the 16th year that the purpose was frustrated. I can clearly see where that would be inappropriate. But when you have a lease that hadn't yet started and it was only a three-year lease, the purpose here was frustrated. No one in their right mind would have signed this lease as of May or June of 2020. It offered, and we think that's exactly what the McCarthy case holds, that the reasons that the tenant would have entered into the lease no longer make sense and no longer give him the benefit of the bargain, and therefore it's a frustration of purpose. But by that reasoning, just an economic downturn might prompt somebody in their right mind not to sign a lease like that two months later. I mean, that happens all the time, that people realize that the deal they signed was not a good one. McCarthy says it has to be cataclysmic. An economic downturn, that's to say the Depression and the crash of 29 in Montreal, that would be cataclysmic. But we have to remember what the world was like in the spring of 2020. Things were shut down, and that's the cataclysm. I think the COVID pandemic in this case is cataclysmic and much different from the mere economic... You make the argument that, in your brief, that the reason for the frustration of purpose was that part of the purpose was a highly visible luxury retail location, heavily reliant on foot traffic, with exposure to a particular market of wealthy shoppers, and that that was what was contemplated by the parties. Is there any language in the contract that makes those points, from which we can extract that information? I think the language is that it's got to be first-class retail consistent with other retailers along the Fifth Avenue corridor, and then we know who the retailers are along Fifth Avenue. But there's nothing inconsistent with what the other retailers had along the avenue, right? No. They're all facing the same thing. So they haven't been deprived of what they were promised, which was a first-class retail establishment along the lines of what everybody else on Fifth Avenue had. I think it's very different when you have a lease that's been going on for 10 years, and you're four years into it, to claim frustration of purpose, as opposed to one that had not yet commenced, the tenant had invested in the property. And I think that's really critical here, with a short-term lease... But the bankruptcy court basically made you whole for that time period, did it not? It gave us 68 days credit just for the government shutdown period, but it didn't recognize the impact of the pandemic and the disappearance of the customers and things like that. But that part of your argument is common to everybody along Fifth Avenue. The only part that you're saying makes you different is that your store wasn't supposed to open until shortly after the shutdown. Right. And the fact that the lease was such a short term, it's not a five or 10-year lease where you can recoup that. So you think that the doctrine turns on the length of the lease? I think that's... That's really one of the factors, because you have to look at the purpose of the lease. If this were to be a 20-year lease, it would be very difficult to argue. I think that the COVID pandemic, which is still there, here we are in a courtroom, it's largely empty, and everyone's wearing masks except us. So you're looking for... The normal rules are the contracts are to be enforced. You're looking for an exception, a COVID exception, essentially? Well, I'm looking to apply what I think the court found in MacArthur, or as it articulated the law in MacArthur, that performance by NTS would no longer give us what we anticipated when we signed the lease in January, that by May 1st or April 1st, because two days after the city was shut down, the landlord said, let's advance the lease date to April 1st. I'm reminded of a law school case involving a barren cow. Everybody thought the cow was able to procreate. The cow was not able to procreate, and they undid it, undid that, because that was the purpose of the sale. That's not what we have here. We have a lease that can be operated, and the business can go forward to the extent they want to. Maybe they may, I don't know whether there was an ability to sublease, sublet or not, but if there was, then that could be done as well. Well, in the market as of summer of 2020, there was no subleasing market. Even today, the real estate market. But Judge Walker, I barely remember that case, but I think it's similar, but not quite the same. So we ask the court to apply the frustration doctrine and reverse, in order that the lease may be rescinded. All right, well, thank you, Mr. Hume. You've got two minutes for rebuttal. Thank you. We'll now hear from Mr. Solomon. For one of your honors, may I please the court? My name is Jay Solomon from Belkin, Vernon, Goldman, LLP. And I'm here representing 605 Fifth Property Owner, LLC, who's the landlord in this case. And based upon two very well-reasoned decisions by the lower court, first from Judge Morris, the Chief Judge of Bankruptcy Court, and then from Judge Seabell in the Southern District of New York. Very well-reasoned decisions, this- Sifo, Sifo. Sifo, excuse me, Sifo, pardon. The landlord urges the court to affirm the final judgements in this case. This is not an unusual circumstance. Well, I don't know- But you can't say it's not unusual. Well, I mean as far as invoking the doctrines of frustration of purpose. They seem to have walked away from the impossibility. But frustration as well. Frustration of purpose does not fit the facts of this case. Because it, first of all, it requires a virtually cataclysmic, holy, unforeseeable event. COVID, as unfortunate as it was, as far as the financial, as far as the retail markets. It's not a cataclysmic event. Stores were shut down for a period of- What if there were a hurricane and the property was in a flood zone that could be affected by a hurricane, would that count? It could be affected, no, that wouldn't count. If a hurricane occurred and a retail premises was wiped out because of the hurricane, certainly that would give rise to an argument of frustration of purpose. Because there, the means of operating the store would have been, for the foreseeable future, completely destroyed. Here, the subject matter of the lease was not destroyed. There's nothing, first of all, there's nothing that prevented the appellant from accessing the store at any time. They could have gone in there. There's nothing that prevented them from starting their pre-construction work, which in fact they did. There were communications here with the landlord for the first month after the lease term commenced, where plans were submitted to the landlord, the landlord reviewed them, made a single comment. We're now into May, send it back to the tenant, say okay, we're good. As soon as the restrictions are lifted on non-essential construction, you can proceed. But then, appellant went dead, silent. And then subsequently, once they were served with a notice of default and notice of termination, then they basically said, no, we want out of this lease. We didn't really hear about it from your colleague, but doesn't the force majeure clause provide for exclusion of obligations under the lease? No, actually in this lease, there is no force majeure provision. There's a force majeure definition. So in the definition section of the lease, there's a force majeure provision. But that provision is only referenced in two articles of the lease. One is their obligation to open within 120 days, which the bankruptcy court excused them because of the shutdown of non-essential business. Did it cover the whole period of time? And more, there was a miscalculation. She actually gave them 76 days of extended free rent instead of 68 days. So they actually got an extra week bonus on there. So their free rent period was extended so that they could do their billed out. This is not a particularly short term lease. The court may be familiar with pop up businesses. Leases are signed all the time for three months, six months. You may be argued anything less than a year is short term. But three years, we're getting into the moderate term of a lease. And what was important to Appellant Desert Wall, a retail fashion store, was to be able to open by the holiday season in 2020. And the prohibition on non-essential construction only delayed them 68 days. So if they had diligently pursued their construction, they would have been open well before. They could have been open basically the first week of October, well before the holiday season. Now, also conceded in their brief, this was not a unique situation for Appellant Desert Wall. They had 12 stores in the United States, six flagship type retail and six factory stores. They closed them all across, in the three states they were operating in. So they didn't pick out this lease and say, well, we're going to operate these other stores because we realize our obligations. They made a corporate decision to close all of their stores. So this one really should be treated no different from the others. The reason- And I guess your point is that that goes to the notion that a Fifth Avenue store is somehow different because it's- No, there is no basis to make determination that is different. And the Appellant Division First Department, which covers Manhattan, recently came out with, they've come out with a number of decisions, all rejecting the frustration of purpose and impossibility defenses. And one of those decisions is the Valentino case, and Valentino is a few blocks away. Valentino was 693 Fifth Avenue, I think four blocks away. Very similar, a mid-block, narrow store. This was not a corner, large, flagship type store on Fifth Avenue. It's a narrow storefront, mid-block. Same exact circumstances as Valentino. And the Appellant Division First Department, in March of 1922, said to tenant, no, no, no. You're not allowed, you can't get out of this lease. There's nothing special. 2022. 2022, I'm sorry. 1922, those were good years. Pardon. But anyway, within months of us appearing here today, we had occasion to focus on a specific store in this location on the Fifth Avenue corridor, and there was no distinction made. Frustration of purpose does not apply here, because number one, as unfortunate the pandemic was, it was a foreseeable event. As we set forth in brief, there have been a host of virus concerns over the past ten years. Mars, SARS, a half dozen other, where the threat of a global pandemic was present. Number two, there is a specific allocation of risk in this lease. 505 is not limited to utilities. In fact, the clause opens with a provision that says, you cannot be liable for any failure to provide access to the premises. That's not a utility provision. That's your ability to use the store, or to assure the beneficial use of the premises. This is not a limited provision. In addition, what is the state of, I think you may have started to answer it, but I'd like to understand it a little better, more comprehensive answer, of New York State law that could bind us in this area? Well, the Appellate Division First Department is appellate authority, and they have multiple cases now that have come down. 585 Seventh Avenue Court v. Times Square Photo Inc., 19483-560- You cited them in your brief. Yes, so yeah, so those are the two appellate- The New York Court of Appeals, anything? No, the issue has not gone up to the New York State Court of Appeals. But the Appellate Division does bind all of the trial courts in that district. And I mentioned the Valentino case, also they affirmed a Gap retail case at 170 Broadway. That was the third case. There's a fourth case, Knickerbocker Retail against Buckner Forever Young. Well, we're required to look, when we're looking at state law, to appellate division cases. The New York Court of Appeals hasn't spoken. Right, yes. And there's no contrary precedent for them? Not at all. As a matter of fact, there was a couple of outliers in some of the trial court cases, the motion court cases. And those cases, one in particular out of Brooklyn, was overruled. I believe the judge actually changed the decision on a motion to re-argue. The other thing here is that in this case, specifically, the landlord made no representations or warranties. Some of the cases that appellant cites, where there was a destruction of the purpose, like there was one case where the restaurant depended on a sewer and the sewer wasn't provided. There were specific representations and warranties by the landlord that the tenant's use was permissible under the law. Here, it's quite the opposite. There are no representations or warranties, and specifically, there's a provision in the lease which the landlord affirmatively states. The landlord is making no warranties about tenant's use of the premises, the suitability of the premises. 2.01? 2.01B, correct. So this lease is perhaps, you'll see, one of the strongest cases in favor of landlord. We have no foreseeability, what we do have is foreseeability that an event like this could happen. Days before this lease was signed, the WHO issued a global warning to hospitals to prepare, because they, to expect a potential global pandemic. They could have refrained from signing this lease, or they could have come back to landlord and asked for modifications to the lease to protect them if there was a pandemic. They had the opportunity to do that, but they failed to. So the lease stands on the four corners. And the appellant's subjective parallel evidence, assertions of what they anticipated and what they expected, are not appropriative evidence here. In fact, they're precluded under the law from affecting what the party's intended under the four corners of the lease. So- I think we've heard your arguments. We'll now hear from Mr. Hume for two minutes of rebuttal. Thank you, Your Honor. Thank you, Mr. Sullivan. Thank you, Judge Sullivan. On the foreseeability point, I'm actually amazed the plaintiff, or the landlord's arguing that. If you look at A366 of the appendix, one week after this lease was signed, Dr. Fauci and Dr. Redfield of the CDC were telling us, don't worry. This virus doesn't get transmitted from human to human. I mean, that's where the state of the science was at the time. We were told well into February, this is not going to be a problem, by March it was. I guess the point is that pandemics were things that sort of were out there. There was SARS, there was the understanding that they could happen, right? Right, but we were told this one wouldn't be happening because it doesn't transmit human to human. That was a week after this lease was signed. So what's the infallibility of Dr. Fauci? Well, he's owned up to that. He calls them as he sees them, right? I'm not faulting him. I note that our society has debated that question. Right. I would also point out that when the landlord, two days after the city shut down, advanced the lease commencement date to April 1st, which actually exacerbates the frustration here. The tenant responded by rejecting that tender and saying we can't take the keys. This was done from the beginning. They may have continued to have discussions, but their initial reaction, it's in the record, rejected the tender. 505 is to be strictly construed under New York law, and it does not do what the landlord says it does do. Where does it say it's limited to utilities, though? It's not, no, it's in the utility section. It's not limited to utilities, but it only offers the landlord contractual protection from breach of lease claims. It doesn't go through frustration of purpose. It could have said tenant may not rescind. It doesn't do that. And if you look at the other cases that have been discussed, all of them involve operating stores under leases, I believe, that are all 510. In Gap's case, it was 16 years, an attempt to argue that the purpose of this lease is frustrated. Where's the bright line? How many years does the lease have to be? Well, I think the bright line in this case is it's a lease that hasn't started, is a clear bright line, where the COVID pandemic intervened. But you could have started it. You admit that. Yes, but the purpose was frustrated, so we didn't start it. In fact, we ended up filing Chapter 11 because of this particular lease. And some of the other stores have reopened. Sixth Avenue store, that there, the landlord had not paid the rent. There's litigation pending in the district court about that. It's a different circumstance. But this store never opened and couldn't open because the CRO who came in decided it just wasn't feasible to open the store and the purpose was frustrated. And we asked the court to recognize that and allow us to rescind the lease. All right, well, thank you both. We will reserve decision.